**ORIGINAL**

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUN 2 6 2008

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **CCH ASSOCIATES, LLC**, a Georgia limited liability company; **CARDIOVASCULAR VENTURES, INC.**, a Georgia corporation; and **DR. CHRISTOPHER U. CATES**, an individual;<br><br>Plaintiffs,<br><br>v.<br><br>**DATASCOPE CORP.**, a Delaware corporation,<br><br>Defendant. | CIVIL ACTION FILE<br><br>NO. _____<br><br>**1:08-CV-2126**<br><br>**WSD** |

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs CCH Associates, LLC ("CCH"); Cardiovascular Ventures, Inc. ("CVI"); and Dr. Christopher U. Cates ("Dr. Cates") (collectively, "Plaintiffs") file this Complaint and Demand for Jury Trial against Defendant Datascope Corp. ("Datascope"), and state as follows:

1

## PARTIES, JURISDICTION, AND VENUE

1.

CCH is a limited liability company organized and existing under the laws of the State of Georgia, with a place of business at 108 Church Street, Hiawassee, Georgia 30546.

2.

CVI is a corporation organized and existing under the laws of the State of Georgia, with a place of business at 315 Riverhall Court, Atlanta, Georgia, 30350-3729.

3.

Dr. Cates is an individual and resides in Atlanta, Georgia. Dr. Cates is the Director of Vascular Intervention at Emory University Hospital and Emory Crawford Long Hospital.

4.

Datascope is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 14 Philips Parkway, Montvale, New Jersey, 07645-1811.

5.

This is an action for patent infringement under the patent laws of the United States, Title 35, United States Code, Section 271 et seq. and arising from

2

Defendant's acts of infringement of United States Patent Nos. 6,056,768 (the "'768 Patent," attached as Exhibit 1); 6,162,240 (the "'240 Patent," attached as Exhibit 2); and 6,699,261 (the "'261 Patent," attached as Exhibit 3) (collectively, the "Patents-in-Suit"), through its importation, manufacture, use, offer for sale, and sale of vascular closure devices, having the trade designations of On-Site™ and VasoSeal® ES.    This action also seeks relief—under state law—to recover damages and restitution owed to Plaintiffs by Datascope as a result of Datascope's actions in wrongful misappropriation and conversion of Dr. Cates's invention from which Datascope has profited handsomely.

6.

This Court has subject matter jurisdiction over the claims and causes of action asserted in this Complaint under: (a) 28 U.S.C. § 1338(a) as this is a case arising under the patent laws of the United States (35 U.S.C. § 1, *et seq.*, and particularly 35 U.S.C. § 271); (b) 28 U.S.C. § 1331 as this matter involves a federal question; (c) 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states; and (d) 28 U.S.C. § 1367 as this matter invokes supplemental jurisdiction.

3

7.

This Court has personal jurisdiction over defendant Datascope because it does business in the State of Georgia; it is registered to do business in this judicial district; and it has used, offered for sale, and sold infringing products to customers within this judicial district.

8.

Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b) because defendant Datascope resides in this judicial district within the meaning of such provisions and because Datascope has transacted business and committed acts of patent infringement in this judicial district.

## FACTUAL BACKGROUND

### THE INVENTORS: DR. CATES, DR. KNOPF, AND DR. WHITNEY

9.

Inventor Dr. Cates received his B.S. degree from the Citadel Military College of South Carolina in 1978 and his M.D. degree from the Medical College of Georgia in 1982. Subsequently, Dr. Cates did an internship, a residency, and a fellowship in cardiology at Vanderbilt University Medical Center. By 1987, Dr. Cates was a Board certified cardiologist and is triple Boarded in Internal Medicine, Cardiology, and Interventional Cardiology. For ten years—from 1988 to 1998—Dr. Cates was a practicing cardiologist at Saint Joseph's Hospital in

4

Atlanta where he served as the Chair of Research at the Heart Institute. Dr. Cates then joined the Emory University School of Medicine in 1998. Currently the Director of Vascular Intervention at both Emory University Hospital and Emory Crawford Long Hospital, he is a nationally and internationally renowned leader in Interventional Cardiology. Throughout his medical career, Dr. Cates has directed numerous clinical research studies in a number of areas, including angina, angioplasty, cardiac catheterization, interventional cardiology, cardiovascular disease, carotid stenting, new training modalities such as VR stimulation and peripheral vascular disease. He has published widely in prestigious medical journals such as Lancet, JAMA, Journal of the American College of Cardiology, Circulation, American Heart Journal, among others. The American College of Cardiology (ACC), the American College of Physicians, the Society of Cardiovascular Angiography and Intervention (SCAI), the Society of Simulation in Healthcare, and International Andreas Gruentzig Society recognize Dr. Cates as a leader in his field. He has been included as an author in Consensus Competence and Credentialing documents and Multisocietal Consensus Expert documents in new technologies. At present, Dr. Cates serves as the Chair of the Board of Governors of SCAI, the worldwide society of interventional cardiology and chairs the carotid initiative committee. Recently,

he was elected to the Board of Trustees for SCAI and the Board of Directors for the Society of Simulation in Healthcare. Moreover, Dr. Cates has held various important posts within ACC and SCAI. He is on the Editorial Board of the Journal of the Society for Simulation in Healthcare. As a renowned lecturer, Dr. Cates has spoken around the world on novel medical subjects and has addressed multiple health policy groups, including CMS, FDA, AHRQ. Dr. Cates has also addressed members of Congress on healthcare issues. For the past fifteen years, Dr. Cates has created and chaired multiple national symposia on novel medical technologies and health policy issues. He is a Fellow for the ACC, SCAI, and the American College of Physicians.

10.

Inventor Dr. William D. Knopf ("Dr. Knopf") is a Phi Beta Kappa graduate of Emory University and a *summa cum laude* graduate of Emory University's School of Medicine. After receiving his medical degree, Dr. Knopf completed his internship and residency at the University of Texas Southwestern Medical School, and his cardiology fellowship at Emory University School of Medicine. From 1987 to 1994, Dr. Knopf served as medical director of the cardiac transplant program at Saint Joseph's Hospital of Atlanta and recently resumed that position. In addition to his clinical duties, he is an associate clinical professor of

6

medicine (cardiology) at the Medical College of Georgia in Augusta. A Fellow of the American College of Cardiology and the Society for Cardiac Angiography and Interventions, Dr. Knopf is recognized as a national leader in interventional cardiology as well as a leading interventionalist at St. Joseph's Hospital specializing in coronary artery stenting, primary angioplasty for acute myocardial infarction, angiogenesis, percutaneous myocardial revascularization, peripheral vascular intervention, brachytherapy, and carotid stenting. He has participated in over one hundred research studies and has published abstracts and articles in such publications as the Journal of the American College of Cardiology, The American Journal of Cardiology, Circulation, and The Journal of Invasive Cardiology. In July 1999, Dr. Knopf founded the American Cardiovascular Research Institute (ACRI), a non-profit organization, to promote and improve the comprehensive care of the cardiovascular patient. He currently serves as Chairman of the Board of ACRI. Dr. Knopf has been instrumental in creating a national cardiovascular symposium, originally begun as Intervention 2000, and continues to serve as an annual course director. Now in its sixth year, Intervention 2005 is an academically monitored live-case CME program for Interventional professionals involving experts in both academic medicine and clinical private practices from around the United States. Dr. Knopf is Board

7

certified in Internal Medicine, Cardiovascular Disease, and Interventional Cardiology.   He is a fellow of the American College of Cardiology and the Society for Cardiac Angiography and Interventions.

11.

Inventor Dr. Douglass G. Whitney ("Dr. Whitney") graduated from Tulane University School of Medicine in New Orleans, Louisiana.   After receiving his medical degree, Dr. Whitney completed his internship and residency at Henry Ford Hospital in Detroit, Michigan.   For over forty years, Dr. Whitney has practiced medicine at Saint Joseph's Hospital as a vascular surgeon.  He is Board certified in both General and Vascular Surgery by the American Board of Surgery, and is, or has been, a member of both the Peripheral Vascular Surgery Society and the International Society for Vascular Specialists.   Dr. Whitney has authored numerous articles in the field of vascular surgery.

### DISCOVERY OF NOVEL METHODS AND DEVICES FOR CLOSING PUNCTURED BLOOD VESSELS

12.

Over three million in-patient percutanous interventions are performed annually in the United States.   Each intervention involves inserting a catheter into a femoral artery or vein.   Once the catheter is removed, a puncture wound remains in the blood vessel.   Because the femoral artery or vein can bleed

8

dangerously after vessel cannulation, the management of the puncture wound has evolved over the years. Today, the vascular closure market is valued at an estimated $490 million dollars annually.

13.

Conventional management of vessel puncture sites has involved manual compression, a labor-intensive practice that required a healthcare provider to press firmly on the puncture site or apply a C-clamp until hemostasis at the arterial puncture site is achieved. Additional consequences of this technique include patient discomfort and immobilization, increased time-to-discharge, and bed-rest restrictions.

14.

The advent of various vascular hemostasis devices ("VHD"), also known as arteriotomy closure devices ("ACD"), brought about several advantages in the field of vascular closure, such as a reduced time for manually compressing the puncture site to achieve hemostasis, an early ambulation of patients, an improved level of patient comfort, and an earlier discharge. These devices work in a variety of ways, from providing hands-free, controlled compression, to delivering collagen extravascularly to the surface of the vessel, to creating a mechanical seal by sandwiching the arteriotomy between a bio-absorbable

anchor and collagen sponge. But complications have been reported with these devices such as pseudoaneurysm, arteriovenous fistula, retroperitoneal hematoma, femoral artery thrombosis, surgical vascular repair, and access site infection.

15.

An alternative to "hands-free" compression, collagen plug, and polymer anchor VHDs was thus developed: percutaneous suture-mediated closure devices ("SMC"). These devices provide definitive closure at the femoral artery puncture site using a blind suture system. And because their primary healing is not dependent upon clot formation, these devices can be used with anticoagulated patients. Additional benefits include easy positioning, no subcutaneous tissue dissection, significant reduction in the time to hemostasis, early mobilization, reduced patient discomfort, and early discharge. But, SCMs tend to fail. Because of the complexity of targeting passage of the suture precisely without direct observation, an inadequate closure often results. The suture site may also cause scarring of the vessel. Despite these problems, SCMs represent approximately one quarter of the total vascular closure market.

16.

As leaders in the field of interventional cardiology, Drs. Cates, Knopf, and Whitney recognized the many problems associated with surgically punctured blood vessels. Thus, approximately fifteen years ago, Drs. Cates, Knopf, and Whitney conceived of novel methods and devices for the closing of punctured blood vessels following cannulations.

17.

Shortly thereafter, Drs. Cates, Knopf, and Whitney prepared and filed United States Patent Application No. 07/817,587 on January 7, 1992. This patent application ultimately issued as the '768 Patent. Subsequent continuation patent applications were filed, resulting in the issuance of the '240 Patent and the '261 Patent.

### THE PATENTS-IN-SUIT

18.

The '768 Patent, titled "Blood Vessel Sealing System," was duly and legally issued on May 2, 2000, by the United States Patent and Trademark Office (the "PTO"), based on an application filed on January 7, 1992, naming Christopher U. Cates, William D. Knopf, and Douglass G. Whitney as inventors. The inventors have assigned the '768 Patent, through intermediate assignments, to CCH.

11

19.

The '240 Patent, titled "Blood Vessel Sealing System," was duly and legally issued on December 19, 2000, by the PTO, based on a continuation application filed on February 3, 1995, naming Christopher U. Cates, William D. Knopf, and Douglass G. Whitney as inventors. The inventors have assigned the '240 Patent, through intermediate assignments, to CCH.

20.

The '261 Patent, titled "Blood Vessel Sealing System," was duly and legally issued on March 2, 2004, by the PTO, based on a continuation application filed on September 7, 2000, naming Christopher U. Cates, William D. Knopf, and Douglass G. Whitney as inventors. The inventors assigned the '261 Patent, through intermediate assignments, to CCH.

21.

The foregoing Patents-in-Suit relate generally to methods and devices for stopping the flow of blood from blood vessels that have been surgically punctured in order to gain access to the interior of the vascular system of a patient. Common medical procedures that require blood vessel puncturing include balloon angioplasty, arteriography, venography, angiography, and other diagnostic procures that use blood vessel catheterization.

12

22.

Datascope did not contribute to the inventions claimed in the Patents-in-Suit.  At no time has Datascope received from the Plaintiffs an assignment or a license regarding the Patents-in-Suit.

### THE INVENTORS' RELATIONSHIP WITH DATASCOPE

23.

For many years, Datascope has been in the business of manufacturing and selling medical devices relating to the management of blood vessel puncture wounds.  Because of the complications with manual-compression management, a section of Datascope's business is devoted to the development of vascular closure devices.

24.

On or about December 5, 1991, Mr. John Cvinar, the then vice president of Datascope and head of Datascope's Vascular Sealing Division, executed an initial Non-Disclosure Agreement (the "Initial NDA") regarding inventions by Drs. Cates, Knopf, and Whitney.  *See* Initial NDA attached as Exhibit 4.  In that Initial NDA, Datascope agreed, *inter alia*, that it would not utilize any information that the inventors disclosed to Datascope regarding their angioplasty and catheterization vascular closure devices.

25.

Also on or about December 5, 1991, Dr. Cates met with personnel from Datascope, including Mr. Cvinar and the then Product Manager for Datascope, Ms. Catherine Faulkner. At that meeting, Dr. Cates disclosed to Datascope— under the terms of the Initial NDA—a detailed illustration of an embodiment of the inventors' novel vascular closure devices. *See* Illustration No. 2, attached as Exhibit 5. Disclosure of this embodiment was acknowledged by Mr. Cvinar and Dr. Cates. *Id.* Dr. Cates also disclosed to Mr. Cvinar and Ms. Faulkner on or about December 5, 1991 various other embodiments of the vascular closure devices and various methods for closure of punctured blood vessels.

26.

One month later, on or about January 8, 1992, Dr. Cates disclosed to Datascope a second illustration of an embodiment of the inventors' novel vascular closure devices. *See* Illustration No. 2, attached as Exhibit 6. Disclosure of that embodiment was acknowledged by the initials of personnel from Datascope and Dr. Cates. *Id.*

27.

Approximately one month later, on or about February 3, 1992, Datascope filed with the Federal Drug Administration ("FDA") a premarket approval

14

application ("PMA") for a vascular closure device to be sold under the trade name "VasoSeal®" and designed to stop the flow of blood from blood vessels that have been surgically punctured. Approval to market that device was granted on September 29, 1995 and notice of approval was given on December 15, 1995. *See* PMA 92004, attached as Exhibit 7.

28.

On or about March 23, 1992, Mr. Cvinar sent to Drs. Cates and Knopf a letter in which Datascope proposed, *inter alia,* to develop and market "systems for achieving hemostasis of punctured blood vessels," the technology that Dr. Cates had previously disclosed to Datascope under the Initial NDA. *See* Letter of March 23, 1992, attached as Exhibit 8. In return for the development and marketing of the vascular closure technology, Datascope proposed that it would have the option to acquire the rights in the issued patent relating to the vascular closure technology. *Id.*

29.

Shortly after Datascope sent its March 23, 1992 letter to Drs. Cates and Knopf, personnel from Datascope traveled from Montval, New Jersey, to Atlanta, Georgia, to discuss Datascope's proposed development and marketing plan. At that meeting, inventor Dr. Whitney took notes regarding the discussions between

15

Datascope and inventors Drs. Cates, Knopf, and Whitney. *See* Exhibit 8 at p. 2. At the conclusion of their meeting with Datascope, Drs. Cates, Knopf, and Whitney rejected Datascope's proposed development and marketing plan.

30.

On or about April 13, 1992, Dr. Cates disclosed to Datascope a third illustration of an embodiment of the vascular closure device. *See* Illustration No. 3, attached as Exhibit 9. Personnel from Datascope and Dr. Cates acknowledged disclosure of this embodiment to Datascope by adding their initials to the illustration. *Id.*

31.

After unsuccessful attempts to negotiate an agreement with Datascope, Drs. Cates, Knopf, and Whitney assigned their rights in patents pending to CVI which initiated its own development and clinical testing of the vascular closure device through CVI.

32.

In July 1994, CVI constructed prototype vascular closure devices and utilized those devices in animal studies at Auburn University's Scott Ritchey Research Center. The studies assessed the relative safety of the vascular closure devices, their effectiveness in achieving rapid hemostasis, and any risks or

16

undesirable effects associated with their use.  Data obtained from those studies demonstrated that the inventors' novel vascular closure devices successfully sealed the arterial puncture site and reduced the time to achieve hemostasis, without complications.

33.

On or about October 31, 1995, Dr. Cates, on behalf of CVI, met with Mr. Barry Cheskin, the then President of Datascope.  *See* Letter from Mr. Cheskin, attached as Exhibit 10.  At that meeting, Dr. Cates discussed with Mr. Cheskin the inventors' vascular closure technology.  *Id.*  Dr. Cates also provided Mr. Cheskin with a draft non-disclosure agreement (the "Second NDA").

34.

On or about December 15, 1995—and after various revisions to the Second NDA—Ms. Ann Prewett, the then Director of Research and Development of Datascope's Collagen Products Division, executed the revised Second NDA.  *See* Second NDA, attached as Exhibit 11.  In that Second NDA, Datascope agreed, *inter alia*, that it would not utilize any proprietary information provided to it from CVI except for purposes of evaluating the disclosed technology.  *Id.*

17

35.

Under the terms of the Second NDA, Dr. Cates, on behalf of CVI, disclosed to Datascope various embodiments of the vascular closure device that CVI had developed. Dr. Cates also disclosed to Datascope, under the terms of the Second NDA, various marketing materials associated with the vascular closure device embodiments.

36.

About one month after Dr. Cates's disclosure to Datascope, Datascope filed with the FDA a first supplement to its PMA authorizing distribution of its VasoSeal® vascular closure devices. *See* PMA 92004 S001, attached as Exhibit 12.

## DEFENDANT'S VASCULAR CLOSURE DEVICES

37.

In 1995, Datascope received its PMA to manufacture and market its VasoSeal® VHD device. Requiring three separate steps—measuring, advancing a sheath, and delivering collagen extravascularly to the surface of the puncture tract—the VasoSeal® VHD device relies on the body's natural method of achieving hemostasis. Specifically, the delivered collagen attracts and activates platelets in the puncture tract, forming a coagulum that results in a seal at the puncture site.

38.

Approximately four years later, in 1999, Datascope introduced a second-generation VasoSeal® device marketed under the name VasoSeal ES®. This device is essentially the same as the VHD device except that there is no measuring step and it incorporates a locater system that provides an improved method of locating the blood vessel.

39.

In 2002, Datascope released the VasoSeal® Low Profile device—a smaller version of its VasoSeal® VHD device—designed to be compatible with smaller sheaths.

40.

Also approved by the FDA in 2002 was Datascope's third-generation device: the VasoSeal® Elite. Employing a sponge collagen technology to produce hemostasis, the Elite device positions sponge collagen into a patient's tissue tract, just above the blood vessel, in a compressed form.

41.

In late May 2005, the FDA provided Datascope approval to market the On-Site™ vascular closure device. On-Site™ devices eliminate (1) the need for a second operator to hold occlusive pressure during the deployment of the

19

collagen-sealing plug and (2) the dependence on operator technique because the collagen plug is indicia-guided to the appropriate site within the puncture wound.

42.

On information and belief, Datascope has earned substantial sales and profits by manufacturing and selling vascular sealing devices covered by the Patents-in-Suit.

## CLAIMS FOR RELIEF

### COUNT I.
#### WILLFUL PATENT INFRINGEMENT

43.

CCH realleges, adopts, and incorporates by reference its allegations included within Paragraphs 1 through 42, above, as if they were fully set forth herein.

44.

Datascope has commenced and continues acts of importing, making, using, offering for sale, and/or selling the On-Site™ and VasoSeal® ES vascular closure devices that infringe one or more claims of the Patents-in-Suit.

20

45.

Datascope has also induced and continues to induce others to infringe one or more claims of the Patents-in-Suit.

46.

Datascope commenced such acts of infringement despite its knowledge of the Patents-in-Suit.

47.

Datascope has carried out these acts of infringement intentionally, willfully, and deliberately.

48.

Datascope has wrongfully benefited by infringing the Patents-in-Suit.

49.

CCH has been and continues to be damaged by Datascope's past and continuing direct infringement and inducement of infringement of the Patents-in-Suit, and will continue to be damaged in an amount to be determined at trial.

50.

CCH has been and continues to be irreparably injured by Datascope's past and continuing direct infringement and inducement of infringement of the Patents-in-Suit, and Datascope's infringing activities will continue unless

enjoined by this Court pursuant to 35 U.S.C. § 283. Consequently, CCH is without an adequate remedy at law.

## COUNT II.
### BREACH OF CONTRACT

51.

Dr. Cates realleges, adopts, and incorporates by reference its allegations included within Paragraphs 1 through 50, above, as if they were fully set forth herein.

52.

Dr. Cates and Datascope entered into the Initial NDA concerning Drs. Cates, Knopf, and Whitney's novel vascular closure devices.

53.

The Initial NDA constitutes a valid and enforceable contract.

54.

Dr. Cates performed as required under the Initial NDA.

55.

In what now appears to be a pattern of conduct designed to injure the Plaintiffs, Datascope breached the Initial NDA, without limitation, by disclosing and utilizing the confidential information relating to the novel vascular closure devices of Drs. Cates, Knopf, and Whitney.

22

56.

As a direct result of Datascope's breach of the Initial NDA, Dr. Cates has suffered substantial monetary losses and Datascope has obtained profits, revenue, and other benefits to which it was otherwise not entitled.

57.

Dr. Cates has been damaged by Datascope's violation of the Initial NDA in an amount to be fully determined at trial.

## COUNT III.
### BREACH OF CONTRACT

58.

CVI realleges, adopts, and incorporates by reference its allegations included within Paragraphs 1 through 57, above, as if they were fully set forth herein.

59.

CVI and Datascope entered into the Second NDA concerning the novel vascular closure devices of Drs. Cates, Knopf, and Whitney.

60.

The Second NDA constitutes a valid and enforceable contract.

61.

CVI performed as required under the Second NDA.

62.

In what now appears to be a pattern of conduct designed to injure the Plaintiffs, Datascope breached the Second NDA, without limitation, by disclosing, disseminating, and utilizing the proprietary information relating to novel vascular sealing devices for the closure of puncture wounds conceived by Drs. Cates, Knopf, and Whitney.

63.

As a direct result of Datascope's breach of the Second NDA, CVI has suffered substantial monetary losses and Datascope has obtained profits, revenue, and other benefits to which it was otherwise not entitled.

64.

CVI has been damaged by Datascope's violation of the Second NDA in an amount to be fully determined at trial.

## COUNT IV.
### BREACH OF IMPLIED CONTRACT

65.

CCH realleges, adopts, and incorporates by reference its allegations included within Paragraphs 1 through 64, above, as if they were fully set forth herein.

24

66.

Datascope's use of the inventions—disclosed by Dr. Cates and later claimed in the Patents-in-Suit—and the sales and profits derived therefrom, create an implied contractual obligation for Datascope to compensate CCH for the use of those inventions.

67.

CCH performed as required under the implied contract.

68.

In what now appears to be a pattern of conduct designed to injure the CCH, Datascope breached the implied contract, without limitation, by disclosing and utilizing the confidential information relating to the novel vascular closure devices of Drs. Cates, Knopf, and Whitney and failing to compensate CCH for the use of those inventions.

69.

As a direct and proximate result of the wrongful conduct of Datascope, CCH has suffered damages in an amount to be determined at trial and/or is entitled to a reasonable royalty for the use of the inventions.

## COUNT V.
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

70.

CVI and Dr. Cates reallege, adopt, and incorporate by reference their allegations included within Paragraphs 1 through 69, above, as if they were fully set forth herein.

71.

The express and implied terms of the Initial NDA and Second NDA, and the parties' course of dealings and performance, imposed the obligation of good faith and fair dealing in contract performance on Datascope.

72.

By its conduct, Datascope has materially breached the obligations of good faith and fair dealing.

73.

As a direct and proximate result of Datascope's breach of the obligations of good faith and fair dealing, CVI and Dr. Cates have suffered damages in an amount to be determined at trial.

## COUNT VI.
### UNJUST ENRICHMENT

74.

CVI and Dr. Cates reallege, adopt, and incorporate by reference their allegations included within Paragraphs 1 through 73, above, as if they were fully set forth herein.

75.

By misappropriating Dr. Cates's considerable expertise and confidential and proprietary information for its financial benefit, Datascope has been unjustly enriched because it knowingly received information and expertise of value that it was not entitled to and then wrongfully retained the benefits received without compensation to CVI and Dr. Cates.

76.

As a direct and proximate cause of Datascope's actions, CVI and Dr. Cates have suffered substantial monetary losses and Datascope has obtained profits, revenue, and other benefits to which they are otherwise not entitled.

77.

Datascope has therefore been unjustly enriched in an amount to be determined at trial.

## COUNT VII.
### CONVERSION

78.

CCH realleges, adopts, and incorporates by reference its allegations included within Paragraphs 1 through 77, above, as if they were fully set forth herein.

79.

CCH, as assignee of the subject matter of the Patents-in-Suit, is the owner of the Patents-in-Suit.

80.

Datascope, however, has wrongfully exercised ownership, control, and dominion over the subject matter claimed in the Patents-in-Suit. The conduct of Datascope was designed to obtain and retain the rights to CCH's patented inventions, which it had no right to obtain and retain, thereby converting the property and patent rights of CCH.

81.

CCH has been and continues to suffer damages from such wrongful and unlawful conversion in an amount to be determined at trial.

## COUNT VIII.
### VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT

82.

Plaintiffs reallege, adopt, and incorporate by reference their allegations included within Paragraphs 1 through 81, above, as if they were fully set forth herein.

83.

Datascope has engaged and continues to engage in trade and commerce, including within the state of Georgia, through its efforts to develop, make, and sell medical devices.

84.

Datascope's actions in concealing and failing to disclose its intent to file a PMA with the FDA for vascular closure devices conceived by Drs. Cates, Knopf, and Whitney and owned by CCH constitute unfair, unlawful, or deceptive practices. Likewise, Datascope's actions in seeking and obtaining the PMA for vascular closure devices conceived by Drs. Cates, Knopf, and Whitney and owned by CCH without authorization from Drs. Cates, Knopf, and Whitney and CCH constitute unfair, unlawful, or deceptive practices.

85.

Datascope's unfair, unlawful, or deceptive practices violate the Georgia Fair Business Practices Act of 1975, and particularly, Official Code of Georgia Annotated § 10-1-393 ("GFBPA").

86.

Datascope has enjoyed substantial advantages, profits, and income as a result of its unfair, unlawful, or deceptive practices.  Since issuance of its PMA, Datascope has, without authorization, enjoyed the exclusive right to practice the inventions of the Patents-in-Suit within the United States.  Datascope has exercised that right since at least December, 1995, by making, offering for sale, and selling VasoSeal® ES and On-Site™ products covered by the Patents-in-Suit.

87.

Datascope's actions have injured and damaged Plaintiffs.  Plaintiffs therefore seek restitution of Datascope's gains from its unfair, unlawful, or deceptive practices in an amount to be determined at trial.

88.

Datascope's actions were a willful and intentional violation of the GFBPA and Plaintiffs are entitled to exemplary damages, reasonable attorney's fees, and expenses of litigation in an amount to be determined at trial.

**REQUESTED RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

    (a)    find that Datascope infringed and induced others to infringe the Patents-in-Suit;

    (b)    award to CCH compensatory damages for Datascope's direct infringement and inducement of infringement of the Patents-in-Suit;

    (c)    permanently enjoin Datascope from importing, manufacturing, using, offering for sale, and selling infringing products, including, but not limited to, the VasoSeal® ES and On-Site™ devices;

    (d)    award to CCH enhanced damages resulting from the knowing, deliberate, and willful nature of Datascope's prohibited conduct, as provided in 35 U.S.C. § 284;

    (e)    award reasonable attorneys' fees incurred by CCH, as provided in 35 U.S.C. § 285;

    (f)    award to CVI and Dr. Cates damages adequate to compensate them for Datascope's breach of contract and breach of good faith and fair dealings;

31

(g)     award to CCH damages adequate to compensate it for Datascope's breach of implied contract;

(h)     disgorge Datascope of all profits unjustly earned because of its conversion;

(i)     award to CCH restitution of the benefits Datascope has gained through its unfair, deceptive or illegal acts;

(j)     award to Plaintiffs its costs, expenses, and prejudgment and post-judgment interest as provided by law; and

(k)     award to Plaintiffs such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, under Rule 38 of the Federal Rules of Civil Procedure, request a

trial by jury of any issues triable of right by a jury.

Respectfully submitted this June 26, 2008.

Anthony B. Askew
*Georgia Bar No. 025,300*
Stephen M. Schaetzel
*Georgia Bar No. 628,653*
Katrina M. Quicker
*Georgia Bar No. 590,859*
Jason M. Pass
*Georgia Bar No. 140,972*
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309-3521
(404) 572-4600 (telephone)
(404) 572-5135 (facsimile)

Attorneys for Plaintiffs CCH Associates, LLC;
Cardiovascular Ventures, Inc.; and Dr. Christopher
U. Cates

33